# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| KARRISSA G., | |
|---|---|
| Plaintiff, | CIVIL ACTION NO. 3:16-CV-01130 |
| v. | (JUDGE CAPUTO) |
| POCONO MOUNTAIN SCHOOL DISTRICT, | |
| Defendant. | |

## MEMORANDUM

Presently before this Court are cross-motions for judgment on the administrative record filed by Plaintiff Karrissa G. and Defendant Pocono Mountain School District. Because the evaluation provided to Plaintiff was timely and appropriate, and the accommodations afforded to Plaintiff provided a free appropriate public education, Defendant's Motion for Judgment on the Administrative Record will be granted.

## I. Background

### A. Factual History

Following her parents' relocation[1] Plaintiff Karrissa G, a minor student, enrolled in the Pocono Mountain School District ("the District") on April 29, 2013. (NT 62-63; S-47.)[2] Prior to arriving at the District, Plaintiff was enrolled in public schools in New York.[3] (S-1, 2.) She entered the District as a seventh-grade student without any reported health problems, developmental or behavioral difficulties, or diagnoses of disability. (S-2, 3, 15; NT 351)

---

[1] Plaintiff and her mother relocated following her parents' separation. Her father remained in New York.

[2] Record citations will follow the format used by the Hearing Officer and reflected on this Court's docket.

[3] Plaintiff had a regular attendance record at her prior school district before the 2012-2013 school year. (S-1; HO, at 2.)

Notably, this meant that Plaintiff entered the District without identification as an eligible student under the Individuals with Disabilities Education Act ("IDEA"), or Section 504 of the Rehabilitation Act of 1973 ("Section 504").

Plaintiff did not regularly attend school during the 2012-13 school year. In fact, after enrolling in the District on April 29, 2013, school officials noted that she spent "less than two days" in the District before moving back to New York to live with her father. (NT 85; S-6, 15, 40, 47.) Consistent with Plaintiff's apparent relocation to New York, but citing Plaintiff's anxiety, Plaintiff's mother attempted to withdraw Plaintiff from the District on June 4, 2013. (S-2, 15.) On July 17, 2013 the District formally denied the request to withdraw Plaintiff from school because Plaintiff's mother failed to note–as required–where Plaintiff would be continuing her education. (*Id.*; P-2). At the same time, the District notified Plaintiff that she had failed to pass the seventh grade due to her poor academic performance. (P-2.)

Plaintiff returned to the District for the 2013-14 school year expecting to retake seventh grade. However, her mother was informed of an alternative program offered by the District–the Pocono Mountain Academy ("the Academy")–that would allow Plaintiff to advance to eighth grade. The Academy was designed on a Response-to-Intervention ("RTI") model and was tailored to promote students who would otherwise be retained in an earlier class year. This program provides students with small classes and specially designed education interventions, including counseling, with the purpose of supporting students emotionally. (NT 111-121, 128-130; S-5.) Further, this program was specifically designed to monitor a student before a decision was made as to whether a formal IDEA evaluation was needed. Plaintiff's parents consented to her placement in the Pocono Mountain Academy. (NT 64-67, 111-113; S-6, 40.)

As required by the Academy program, Plaintiff met with an assigned counselor on September 24, 2013 to discuss the problems she was encountering at school; namely her

2

absenteeism. (NT100-101; S-33.) During conversations with her counselor Plaintiff stated that she was upset about having to leave her home and friends in New York.[4] (NT 100-101, 118, 131; S-33). Because District personnel believed that Plaintiff's absenteeism was a result of a short-term problem related to Plaintiff's transition to a new home and school, District personnel did not refer Plaintiff for a formal evaluation as would be required if they believed Plaintiff suffered from an emotional disorder. (HO, at 3 ¶17.) Plaintiff's counselor provided her a list of private therapists[5] in case Plaintiff wished to talk to someone outside of the District and constructed a re-entry plan for Plaintiff to gradually start getting back to class. (S-33).

Plaintiff's attendance improved at the outset of the 2013-14 school year. For example, in September of 2013 Plaintiff was absent 13 days, but only missed 4 days in October of 2013. (S-33; HO, at 4 ¶22.) While Plaintiff's attendance record was "far from good," the District believed that Plaintiff was making improvements due to her participation in the Academy program. (NT 104.) Unfortunately, even though Plaintiff's attendance had improved the District reported her truancy. On December 4, 2013, a criminal complaint was filed against Plaintiff's mother related to Plaintiff's unexcused absences from school.

During the 2013-14 school year, Plaintiff was required to sit for a state-wide standardized test known as the Pennsylvania System of School Assessment exam or

---

[4] While Plaintiff's mother reiterated the concerns expressed by Plaintiff, she did not inform any District personnel that Plaintiff had been diagnosed with any anxiety disorder during the first half of the 2013-2014 school year.(NT 99, 303-304, 306.) Despite not informing the District, Plaintiff's mother claims Plaintiff was diagnosed with an anxiety disorder in the first half of the 2013-14 school year. (NT 304, 305.) Significantly, Plaintiff acknowledged at a hearing on December 6, 2017 that no such diagnosis exists in the record before this Court.

[5] The District was aware that Plaintiff was seeing a private counselor by November 4, 2013. (S-33)

3

PSSA. (S-34.) This exam is "an annual, standards-based assessment used to measure a students attainment of academic standards." (*Id.*) Specifically, the assessment tests proficiency in four subjects: math, reading, science, and writing. (*Id.*) Plaintiff scored "basic," a score below proficient, in math, science, and writing. (*Id.*) But, she did obtain a proficient score in reading. (*Id.*) While these scores are far from optimal, school officials were surprised Plaintiff did this well considering the amount of school she missed in the 2012-13 and 2013-14 school years. (NT 169-171.)

On April 29, 2014 Plaintiff's mother requested the school conduct a full educational evaluation of Plaintiff to determine if Plaintiff was in need of special education services. (S-10; NT 200.) At that time, the District knew that an evaluation was requested due to Plaintiff's mother's concern about Plaintiff's anxiety. (NT 200.) Plaintiff was evaluated by a certified school psychologist who ultimately prepared a report regarding Plaintiff's evaluation. (S-15.) This report concluded that Plaintiff was not a child with a disability as defined by the IDEA.[6] (*Id.*) The report did, however, recommend a Section 504 service agreement in recognition of Plaintiff's mild anxiety. (*Id.*) Further, the report noted that many of her academic problems stemmed from poor attendance, which was likely fueled by Plaintiff's mild anxiety related to her relocation to Pennsylvania. (*Id.*) On August 22, 2014, the District provided this report to Plaintiff's parents. (*Id.*)

After a satisfactory performance in eighth grade, and the completion of a full evaluation, Plaintiff began ninth grade at the local high school. (S-17.) However, immediately upon starting the 2014-15 school year Plaintiff's mother applied to enroll

---

[6] The evaluation considered all IDEA disability classifications and concluded that Plaintiff's educational history, behavior, and self-reported emotions did not fall within any IDEA disability definition (S-15.)

4

Plaintiff in a cyber charter school.[7] Ultimately, Plaintiff enrolled in the cyber charter school on September 22, 2014. (S-18; NT 332-33.)

Plaintiff's stay at the cyber charter school was short lived. She returned to the District on November 21, 2014. (S-18, 22; NT 335-36). Upon Plaintiff's return to the District high school Plaintiff was provided a Section 504 service plan.[8] This plan was designed to mitigate the mild anxiety Plaintiff reported during her psychological evaluation in June of 2014. (S-15, 23). The Section 504 service plan contained two accommodations. First, Plaintiff was allowed to leave class five minutes early to provide her an adequate amount of time to find her next classroom. Second, Plaintiff was allowed to remove herself from class and report to the guidance office anytime she had feelings associated with anxiety. (S-23.) Notably, during her time at the cyber charter school, Plaintiff received no special education services or Section 504 accommodations. (S-22.)

Plaintiff was routinely absent from class after her return to the District in November of 2014. In fact, between November 21, 2014 and January 23, 2015, Plaintiff was absent twenty-eight times. (NT 365-68; S-28.) Again, Plaintiff's mother believed these absences were caused by Plaintiff's anxiety. (NT 343.) Because Plaintiff's mother believed that going to school with anxiety was "too much for her," she withdrew Plaintiff from the District on January 23, 2015. (S-24, 25.) Plaintiff was re-enrolled in a cyber charter school on February 2, 2015. Plaintiff remained enrolled at the cyber charter school for the remainder of the

---

[7] It is not immediately clear that Plaintiff's mother removed Plaintiff from the District high school because of a lack of academic and emotional accommodations. At a hearing before this Court on December 6, 2017, Plaintiff's counsel acknowledged that one of the motivations for Plaintiff's enrollment in the cyber charter school was ending the truancy action plaguing Plaintiff's mother.

[8] Plaintiff's mother approved of the implementation of the Section 504 service plan. (S-23.)

5

2014-15 school year. Unfortunately, while enrolled at the charter school Plaintiff frequently missed class and was not advancing academically. (NT 374, 382; S-18, 27.)

In September of 2015 Plaintiff was re-enrolled in the District high school for tenth grade; the 2015-16 school year. (NT 344.) Upon her return to the District, she was referred to school-based mental health services, and an anxiety support group. Plaintiff regularly participated in the anxiety support group. Additionally, Plaintiff's Section 504 service plan remained in place. But, Plaintiff did not regularly use the accommodation offered. In fact, Plaintiff remarked to her counselor that she "was not having situations with anxiety at school." (NT 392.) For this reason, while plaintiff checked in with her guidance counselor when required, she only sought out her counselor on one occasion during the 2015-16 school year. (HO, at 7 ¶61.) Overall, Plaintiff's school experience improved in the tenth grade; her grades improved and she was overcoming any anxiety she had suffered earlier.

**B.    Procedural History**

Based on the foregoing facts, Plaintiff's mother filed a due process claim against the District on or about July 16, 2015 requesting a hearing pursuant to the IDEA and Section 504. (Doc 9-5.) Specifically, the due process claim alleges that the District failed to "timely and appropriately evaluate and identify [Plaintiff] as a student with special education needs. . . [d]espite [Plaintiff's] significant academic, social, emotional, behavioral, and executive functioning needs. . . ." (*Id.*, at 2). As relief, Plaintiff requested: (1) the development and implementation of an appropriate program and placement; (2) an IEE to determine Plaintiff's complete educational needs, including a psycho-educational evaluation; (3) full days of compensatory education from the beginning of the 2013-14 school year until the District develops an appropriate educational program for Plaintiff; and (4) reasonable attorneys' fees and costs. (*Id.*)

The Hearing Officer conducted evidentiary hearings on February 1, 2016 and February 6, 2016. (HO, at 1.) By decision dated March 15, 2016, the Hearing Officer denied

the relief requested by Plaintiff. (HO, at 1, 21). The Hearing Officer did so because he concluded that Plaintiff had failed to offer sufficient evidence that the District failed to perform its Child Find obligations under the IDEA or to provide appropriate accommodations under Section 504. (HO, at 21.)

Following the decision of the Hearing Officer, Plaintiff timely appealed by filing a Complaint (Doc. 1) with this Court on June 13, 2016. The District filed their Answer (Doc. 10) on August 2, 2016. Thereafter, on June 30, 2017, the District filed a Motion for Judgment on the Administrative Record and a supporting brief. (Docs. 18-19.) That day, Plaintiff also filed a Motion for Judgment on the Administrative Record (Doc. 20). Both Motions have been fully briefed and are ripe for disposition.

## II. Legal Standards

### A. Review Under IDEA

A district court has jurisdiction to review the decision of a state educational agency under the IDEA. *See* 20 U.S.C. § 1415(i)(2)(A); *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3rd Cir. 2012). The party challenging the administrative decision in the district court bears the burden of persuasion. *See Ridley*, 680 F.3d at 270; *see also Sch. Dist. of Pittsburgh v. C.M.C.*, No. 16-092, 2016 WL 4273175, at *5 (W.D. Pa. Aug. 12, 2016).

"When considering a petition for review challenging a state administrative decision under the IDEA, a district court 'applies a nontraditional standard of review, sometimes referred to as a modified *de novo* review.'" *Ridley*, 680 F.3d at 268 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)). A district court must give "due weight" to the finding of the hearing officer under this standard. *See id*. (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)). "Factual findings from the administrative proceedings are to be considered *prima facie* correct. 'If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities.'" *Id*. (quoting *S.H. v. State-Operated Sch. Dist. of Newark*,

336 F.3d 260, 270 (3d Cir. 2003)); *see also D.S.*, 602 F.3d at 564 ("The 'due weight' obligation prevents district courts from imposing their own view of preferable education methods on the states.").

Further, when a hearing officer "has heard live testimony and determined that one witness is more credible than another witness, [the hearing officer's] determination is due special weight." *Ridley*, 680 F.3d at 268. A district court "must accept the [hearing officer's] credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Id*. (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199(3d Cir. 2004)) (emphasis in original). A district court, however, is not bound by the hearing officer's conclusions of law, and the application of legal standards at the administrative hearing are subject to *de novo* review. *See In re Educational Assignment of Joseph R.*, 318 F. App'x 113, 118 (3d Cir. 2009) ("In contrast, the 'due weight' to be afforded to the administrative proceedings is 'not implicated with respect to issues of law, such as the proper interpretation of the IDEA and its requirements'; that is, the district court owes no deference to conclusions of law drawn by a state or local educational agency." (alteration omitted)).

## B. Review Under Section 504

While there are clear similarities between the mandates of the IDEA and Section 504, courts have been reluctant to apply the "modified *de novo*" review standard to cases involving Section 504. Instead, courts have applied a traditional *de novo* standard to cases arising under Section 504. *See, e.g.*, *T.F. v. Chapel Area Sch. Dist.*, 589 Fed. App'x. 594, 598 (3d Cir. 2014); *Timothy F. v. Antietam Sch. Dist.*, 2014 WL 1301955, *4 (E.D. Pa Mar. 31, 2014) ("[T]here appears to be no direct guidance on the standard of review applicable to claims under Section 504, but despite the similarity of the substantive provisions of Section 504 and the IDEA, [courts in our Circuit] have applied an ordinary *de novo* standard to Section 504 rather than the modified version."); *Molly L. v. Lower Merion Sch. Dist.*, 194 F. Supp. 2d 422, 430 (E.D. Pa. 2002). *But, see Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 482 (E.D. Pa

2011) (noting that some courts outside of the Third Circuit have found that the same standards of review apply to both IDEA and the Rehabilitation Act cases).

### III. Discussion

**A.     Statutory Framework**

    1.     The IDEA

The IDEA requires that states receiving federal education funding provide all disabled children with a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1). The statute seeks "to ensure that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). "Although a state is not required to maximize the potential of every handicapped child, it must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." *Ridley*, 680 F.3d at 269 (quoting *D.S.*, 602 F.3d at 556). The provision of a "trivial educational benefit" does not suffice. *Id*.

Earlier this year, the United States Supreme Court addressed the appropriate standard for determining whether a child receives sufficient educational benefits to satisfy the IDEA. *See Endrew F v. Douglas Cnty Sch. Dist.*, 137 S. Ct. 988, 993 (2017). In *Endrew F.*, the Supreme Court rejected the view that the IDEA requires only the provision of an educational benefit that is "merely more than *de minimis*." *Id*. at 1001. The *Endrew F.* Court explained that a "student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all." *Id*. Thus, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. at 999. Although the *Endrew F.* Court declined to "elaborate on what 'appropriate' progress [would] look like from case to case," the Court made certain that the "absence of a bright-line rule . . .

9

should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id*. at 1001 (quoting *Rowley*, 548 U.S. at 206, 102 S. Ct. 3034).

    2.    <u>Section 504 of the Rehabilitation Act</u>

The Rehabilitation Act prohibits discrimination on the basis of disability in federally funded programs. *See generally*, 29 U.S.C. §§701, 794. Specifically, the Act notes that:

> "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

29 U.S.C. §794(a) ("Section 504"). The definition of a "disability" under this Act is imported from the Americans with Disabilities Act (ADA"). *Id.* at §705(20)(B); *accord Centennial Sch. Dist. v. Philadelphia*, 799 F. Supp. 2d 473, 483 (E.D. Pa. 2011). The ADA defines an "individual with a disability" as any person who has a "physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. §12102(1). Further, the definition of a "major life activity" includes learning, reading, concentrating, thinking, communicating, and working. *Id.* at §12102(2). As compared to the IDEA, Section 504 provides a broader definition to the term "disability. But, both the IDEA and Section 504 serve a similar purpose. As the Third Circuit has explained, both require "schools that receive federal financial assistance to provide a free appropriate public education to each qualified handicapped person . . . ." *Ridley*, 680 F.3d at 280. "To offer an 'appropriate education' under the Rehabilitation Act, a school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Id.* at 280. If such opportunity is denied to a disabled student, that student may have a claim under Section 504.

10

**B.     Plaintiff's Challenges to the Hearing Officer's Decision**

Because Plaintiff seeks relief from the Hearing Officer's decision, she bears the burden of persuasion. *See Ridley*, 680 F.3d at 270. Plaintiff argues that the Hearing Officer's decision should be reversed for two reasons. First, Plaintiff contends that the Hearing Officer incorrectly found that the district fulfilled its statutory Child Find obligations because the evaluation provided was untimely and inappropriate. Second, Plaintiff argues that the Hearing Officer erred in finding that the District fulfilled its obligations under Section 504 to provide FAPE because the service plan developed by the District was "rudimentary and inappropriate." (Doc. 21, at 3). Additionally, if this Court finds that the Hearing Officer did err with respect to one of the two issues raised above, then Plaintiff claims that the Hearing Officer also incorrectly denied an award of compensatory education and a request for an IEE at public expense.

At bottom, Plaintiff argues that the Hearing Officer "myopically looked only to indicators of [Plaintiff's] purported educational progress, and dismissed substantial countervailing evidence of a lack of progress compared to her educational potential." (Doc. 21, at 3.)

    1.     <u>The District Satisfied its Child Find Obligations under the IDEA</u>

        (a)     *The District Timely Evaluated Plaintiff*

There is no question that the IDEA imposes upon a school district the "continuing obligation . . . to identify and evaluate all students who are reasonably suspected of having a disability under the statut[e]." *Ridley*, 680 F.3d at 271 (citing *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009)); *accord* 20 U.S.C. §1412(a)(3)(A). Significantly, however, this obligation does not require that every struggling student be subject to an evaluation. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012). Rather, an evaluation only follows after a school district could have "reasonably suspected" a student had a disability as defined pursuant to the IDEA. *Id.* Once a District reasonably suspects a student suffers from a covered disability, it has a "reasonable amount of time" to evaluate that student for an accommodation. *See W.B. v. Matula*, 67

F.3d 484, 501; see also *Ridley*, 680 F.3d at 272 n.5 (explaining that the precedent in *Matula* applies in cases arising in Pennsylvania). Unfortunately, neither the IDEA nor its implementing regulations establish a deadline by which a student who is suspected of having a disability must be identified and evaluated. The Third Circuit has stated that the "reasonable time" standard is not governed by a bright-line rule, but rather by a case-by-case approach that assesses "whether the school district's response was reasonable in light of the information and resources it possessed." *Ridley*, 680 F.3d at 271-72.

At its core, Plaintiff's complaint hinges on the belief that the District was on notice since the beginning of the 2012-13 school year that she was suffering from severe anxiety and should have "reasonably suspected" that she was suffering from a disability. If true, it follows that the District should have conducted an evaluation well before June of 2014.

Before determining if the evaluation provided to Plaintiff was timely, this Court must first determine whether the District had a "reasonable belief" that Plaintiff suffered from a disability. In finding in favor of the District, the Hearing Officer concluded that Plaintiff's anxiety, and related absenteeism, did not rise to the level of a disability as defined by the IDEA. (HO, at 11-13.) Therefore, no evaluation was owed and any evaluation provided would have been timely. The IDEA defines a "child with a disability" as a child with:

> *[I]ntellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and who, by reason thereof, needs special education and related services.*

20 U.S.C. 1401(3)(A)(I)-(ii). Further, an emotional disturbance means a "condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's performance:"

(1) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
(2) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

12

> (3) Inappropriate types of behavior or feelings under normal circumstances.
> (4) A general pervasive mood of unhappiness or depression.
> (5) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 CFR 300.8(c)(4)(I). Notably, the term "emotional disturbance" does not apply to children who are "socially maladjusted." 34 CFR 300.8(c)(4)(ii). Further, courts have failed to construe a student's general anxiety as a disability under the IDEA. *See, e.g.*, *G.D. v. W. Chester Area Sch. Dist.*, No. 17-969, 2017 WL 3582230, *8 (E.D. Pa. Aug. 18, 2017) (refusing to reverse a Hearing Officer's decision that an anxiety diagnosis that prevented a student from attending school did not amount to a disability under the IDEA.); *Maus v. Wappingers Cent. Sch. Dist.*, 688 F. Supp. 2d 282, 298 (S.D.N.Y. 2010) (noting that a student who suffered "emotional problems, including difficulties interacting with peers, anxiety, and hyperactivity," did not render the student eligible for classification under the IDEA). But, some courts have noted that when a student suffers from a diagnosed anxiety order, obtains failing grades, and is chronically absent from school, the district does have a reasonable basis to believe that a student may be disabled. *See A.W. v. Middletown Area School Dist.*, 2015 WL 390864, at *10 (M.D. Pa. Jan. 28, 2015).

Here, the Hearing Officer found that Plaintiff's undiagnosed, general anxiety did not amount to a disability under the IDEA that should have been recognized by the District. This Court agrees. Additionally, Plaintiff's record of absenteeism standing alone does not provide the District a reasonable basis to believe that Plaintiff was disabled.[9] Since Plaintiff admits the only signs of her alleged disability were her undiagnosed anxiety and absenteeism, the District had no reasonable basis to believe that Plaintiff was disabled as defined under the IDEA.

Even if the District had a basis to believe that Plaintiff was disabled, such basis

---

[9] Plaintiff's counsel agreed with this proposition at a hearing before this Court on December 6, 2017.

13

was obtained, at the earliest, in the middle of the 2013-14 school year.[10] The evaluation provided to Plaintiff occurred in June of 2014. Remember, an evaluation need not immediately follow the identification of a potentially disabled student. *See Ridley*, 680 F.3d at 271-72. Rather, the District has a "reasonable time"–considering both budgetary and staffing pressures–to undertake an evaluation. *See Matula*, 67 F.3d at 501. Here, that delay was only a matter of months[11], and during this delay Plaintiff was participating in a program specifically designed to assess and support a student's academic and emotional needs. (HO, at 4 ¶ ¶18, 19.) Taking into consideration "the limited budgetary and staffing pressures facing the [District,]" this Court believes that the few month delay was reasonable and does not violate the IDEA's Child Find obligations. *Matula*, 67 F.3d at 501.

For these reasons, the evaluation of Plaintiff was timely.

        (b)    *The District's August 2014 Evaluation Was Appropriate*

Plaintiff argues that the District also violated its Child Find obligation by "failing to conduct an appropriate, comprehensive evaluation of [Plaintiff] in the Summer of 2014." (Doc. 21, at 16.) However, this is incorrect.

As noted by the Hearing officer, the evaluation provided by the District was extensive and comported with the requirements of the IDEA. Specifically, the IDEA notes two purposes for an evaluation: (1) to determine whether or not a child is a child with a disability as defined by the IDEA, and (2) to determine the educational needs of such child. 20 U.S.C. 1414(a)(1)(C). To that end, an evaluation must address all "areas

---

[10]     Plaintiff's mother testified before the Hearing Officer that she informed Plaintiff's school counselor that Plaintiff had been diagnosed with anxiety and depression in the middle of the 2013-14 school year. Notably, no official record of such a diagnosis was provided to the school, and no such record has been produced here.

[11]     The exact time of the delay is unknown because Plaintiff has failed to meet her burden to show when the District had reason to know of her disability.

14

related to the suspected disability," and must be "sufficiently comprehensive to identify all of the child's special education and related services needs. . . ." 20 U.S.C. 1414(b)(3)(B); 34 C.F.R. 300.304(c)(4). An evaluation that fails to address the concerns outlined in the IDEA will violate a district's Child Find duties. *See D.K.,* 696 F.3d at 250.

The evaluation conducted in this case was exhaustive. The psychologist tasked to perform the evaluation reviewed: Plaintiff's educational records; reports provided by Plaintiff's teachers; recommendations provided by Plaintiff's teachers; the statement and recommendation of Plaintiff's mother; and cognitive, achievement, and behavior testing. (*See* S-15, *generally*.) The evaluation even specifically employed tests focused on the specific concerns raised by Plaintiff's mother, namely anxiety. Notably, the Hearing Officer stated the District psychologist who conducted the evaluation testified and credibly defended her methodology; her testimony was convincing. (HO, at 17). Paired with the credibility concerns raised by the Hearing Officer regarding Plaintiff's mother's testimony, the Hearing Officer's assessment about the testimony provided by the psychologist is provided "special weight." *Ridley*, 680 F.3d at 268.

Plaintiff first suggests that the evaluation was deficient because the evaluation failed to contain sufficient assessments of Plaintiff's emotional, behavioral, and executive functioning. To the contrary, the evaluation contained multiple tests specific to each of the areas identified by Plaintiff. (S-15, at 11-23; HO, at 16-17.) Next, Plaintiff claims that the evaluation was insufficient because it did not acknowledge Plaintiff's absenteeism. Again, this is without merit. On a number of occasions the report notes that Plaintiff's absenteeism has caused academic struggles. (*See, e.g.,* S-15, at 2-3, 21). However, the evaluation found that the absenteeism was not necessarily tied to any disability. Finally, Plaintiff argues that the evaluation was inappropriate because it did not conclude that she had a disability "despite only several months later providing [her] a 504 Service Plan to address her 'disability' of 'anxiety.'" (Doc. 21, at 17). This argument also fails. The fatal error in Plaintiff's argument is the conflation of the definition of "disability" under the IDEA and the definition under Section 504. These definitions are

15

distinct. *Compare* 42 U.S.C. §12102(1) (definition under the Section 504 and the ADA) *with* 20 U.S.C. 1401(3)(A)(I)-(ii) (definition under the IDEA). Remember, the Section 504 definition of "disabled" is considerably more broad as it seeks to determine if an individual has any "physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. §12102(1). Therefore, Plaintiff may not claim that this evaluation was improper simply because it found her disabled under Section 504 but not under the IDEA.

For these reasons, the Hearing Officer's finding that the evaluation conducted was adequate and appropriate will be affirmed.

2. The District Failed To Provide FAPE During the 2014-15 and 2015-16 School Years

Finally, Plaintiff argues that she was denied FAPE during the 2014-15 (ninth grade) and 2015-16 (tenth grade) school years because she "failed to make reasonable educational progress commensurate with her cognitive and academic potential. . ." "due to a lack of any meaningful and effective supports" from the District. (Doc. 21, at 25). Mindful that this Court is not to substitute its own notion of sound educational policy for those of the local school district and noting that Plaintiff bears the burden of persuasion here, the Hearing Officer's decision that the Plaintiff was offered FAPE during the 2014-15 and 2015-16 school years will be affirmed.

(a) *2014-15 School Year*

The Hearing Officer found that Plaintiff was provided FAPE during the 2014-15 school year. On September 29, 2014 Plaintiff was removed from the District and enrolled in a cyber charter school. She did not return to the District until November 24, 2014. Soon after her return, she was offered a Section 504 Service Plan. This plan, as mentioned earlier, enabled Plaintiff to leave class five minutes early and leave class at anytime she needed to speak to a guidance counselor. (S-15, 23.) The Hearing Officer concluded that this Service Plan was appropriate in light of the stress plaguing Plaintiff, namely anxiety from starting at a new school. Additionally, the Hearing Officer noted that

16

the District was provided no time to offer meaningful modification to the Service Plan after seeing how Plaintiff reacted to it because Plaintiff was once again removed from the District and enrolled in a cyber charter school in January of 2015. Plaintiff remained in the cyber charter school for the remainder of the 2014-15 school year.

Plaintiff believes she was denied FAPE during the 2014-15 school year for two reasons. First, she believes that she was not provided FAPE because she was not immediately provided a Section 504 accommodation when she began the school year. She claims she had to wait so long that she was forced to enroll in a cyber charter school in order to cope with her anxiety. This, however, does not mean that she was denied FAPE. In August of 2014 the District concluded–following a complete education evaluation–that Plaintiff may benefit from a Section 504 accommodation. Roughly twenty school days later, Plaintiff was removed from the District by her mother who cited that lack of a Section 504 accommodation as the reason. Put simply, the school was not required to develop and implement a Section 504 accommodation that quickly. As the courts in this Circuit have held, an accommodation or evaluation must be made "within a reasonable time" of school officials identifying the need for such accommodation. See *Brown ex rel. R.P. v. Sch. Dist. of Phila.,* No. 11-6019, 2012 WL 3064022, *14 (E.D. Pa. July 26, 2012) (citing *Ridgewood*, 172 F.3d at 253; 20 U.S.C. §1412(a)(3)); *A.W.*, 2015 WL 390864 at *16. It would be unreasonable to believe that the District could develop and implement an effective accommodation within the approximately twenty days Plaintiff was enrolled in the District during the beginning of the 2014-15 school year.

Second, Plaintiff claims that the Section 504 accommodations she was ultimately offered were inadequate. Plaintiff contends that the accommodation was inadequate because it did not address her absenteeism. Plaintiff on numerous occasions throughout her briefs posits that the absenteeism was a direct result of her anxiety. The accommodation provided sought to mitigate Plaintiff's "mild anxiety" that had been identified in the earlier evaluation. Outside of mere conjecture, Plaintiff provides no support for her argument that the accommodation was inadequate. Additionally, even if

17

the accommodation as originally crafted was insufficient to mitigate Plaintiff's concerns, the District was provided no opportunity to modify the accommodation because Plaintiff was abruptly removed from the District in January of 2015.

Finally, Plaintiff argues that the Section 504 accommodation was never actually implemented. If true, this provides great concern. But, Plaintiff has cited no evidence within the record to suggest her decision not to take advantage of the accommodation amounts to the District's refusal to implement the accommodation.[12]

At bottom, it is hard to provide any weight to Plaintiff's argument that the District failed to provide her FAPE during the 2014-15 school year when she was only a student in the District for approximately three months.

      (b)    *2015-16 School Year*

The Hearing Officer concluded that Plaintiff was offered FAPE in the 2015-16 school year because he believed the record showed that no Section 504 accommodation was necessary. Not only did Plaintiff fail to utilize the accommodations offered, her grades and attendance improved over the course of the school year. In fact, during a hearing before this Court on December 6, 2017, Plaintiff admitted that her academic performance and attendance issues improved during the 2015-16 school year. The record indicates that Plaintiff reported that she was happy and enjoying school during this academic year. (NT 386.) There is little evidence, as explained by the Hearing Officer, to suggest that Plaintiff was denied FAPE during her second year at the District high school.

### IV. Conclusion

For the above stated reasons, the Hearing Officer's decision will be affirmed. As

---

[12]     Plaintiff claims that she was only permitted to leave class to visit the guidance counselor on two occasions. Outside of those two occasions, she claims that if she needed to speak to a counselor she would have to sneak out of class or make up some excuse so she could escape to the bathroom to contact her private therapist. The record does not support such a finding.

18

such, Defendant's Motion for Judgment on the Administrative Record will be granted and Plaintiff's Motion for Judgment on the Administrative Record will be denied.

An appropriate order follows.

December 11, 2017                                               /s/ A. Richard Caputo

Date                                                               A. Richard Caputo
                                                                          United States District Judge